## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Nicholas Trias,

                Plaintiff,       Case No. 1:18-cv-00986

v.                            Michael L. Brown
                               United States District Judge

State Farm Fire & Casualty
Company,

                Defendant.

_____/

## ORDER

In June 2017, Plaintiff Nicholas Trias's townhouse caught fire. When his insurance provider, Defendant State Farm Fire & Casualty Company ("State Farm") denied his claim, he sued for breach of contract and bad-faith failure to settle. This order addresses all pending motions.

### I.    Factual Background

Plaintiff bought his townhouse for $21,500 in 2013. (Dkts. 50-14 ¶¶ 11–12; 61-1 ¶¶ 11–12.) It is located in Riverdale, Georgia in Taylor Ridge Villas, a community of townhomes governed by the Taylor Ridge Homeowners' Association ("HOA"). (Dkts. 50-14 ¶ 13; 61-1 ¶ 13.)

The fire occurred on the evening of Sunday, June 4, 2017. (Dkts. 50-14 ¶ 1; 61-1 ¶ 1.) Plaintiff had purchased his State Farm insurance policy just nine days before the fire. (Dkts. 50-14 ¶¶ 2–3, 41; 61-1 ¶¶ 2–3, 41.) The policy covered the structure, his personal property inside it, and his loss of use. (*Id.*) It had a liability limit of $119,000, far more than he paid for the townhouse. (Dkts. 50-14 ¶ 42; 61-1 ¶ 42.) He had no insurance on his townhouse for at least a year before getting the policy. (Dkts. 50-14 ¶ 45; 61-1 ¶ 45.)

In the days following his application, Plaintiff called State Farm to request a copy of the policy and ensure it was in effect. (Dkts. 50-14 ¶ 46; 61-1 ¶ 46.) He wanted to make sure the policy was active as of May 26. (*Id.*) He spoke with State Farm's underwriting department and received that assurance. (Dkts. 50-14 ¶ 47; 61-1 ¶ 47.) Less than a week after the fire, Plaintiff cancelled the policy going forward. (Dkts. 50-14 ¶ 124; 61-1 ¶ 124.) This means the policy was in effect for just about two weeks around the time of the fire. Suspicious!

### A.    Plaintiff's Financial Difficulties

Plaintiff was struggling financially at the time of the fire — no one disputes this. When he purchased the policy, he paid the initial premium

payment of $597.16.  This left him with just $21.48 in his checking account.  (Dkts. 50-14 ¶ 43; 61-1 ¶ 43.)  His fixed income was $735 per month in Social Security Disability payments.  (Dkts. 50-14 ¶ 13; 61-1 ¶ 13.)  He estimated his total annual income was between $15,000 and $18,000.  (Dkts. 50-14 ¶ 15; 61-1 ¶ 15.)  Plaintiff kept his money in a NetSpend online checking account or as cash.  (Dkts. 50-14 ¶ 16; 61-1 ¶ 16.)  His online checking account had a balance of $2.50 a few days before the fire.  (Dkts. 50-14 ¶ 17; 61-1 ¶ 17.)  He also had a credit union checking account that was overdrawn by $4,707.51 and owed more than $2,000 on a Visa credit card.  (Dkts. 50-14 ¶¶ 18, 20; 61-1 ¶¶ 18, 20.)  He had only $5.00 in a savings account.  (Dkts. 50-14 ¶ 19; 61-1 ¶ 19.)

On top of this, his HOA had a lien on his property for $6,462.50 as a result of unpaid HOA dues.[1]  (Dkts. 50-14 ¶¶ 21–24; 61-1 ¶¶ 21–24.)  At his Examination Under Oath ("EUO") after the fire, Plaintiff denied the HOA had a judgment against him for unpaid dues but admitted not paying his $150 monthly dues since 2014.  (Dkts. 50-14 ¶¶ 22–23; 61-1 ¶¶ 22–23.)  He said he did not know about the lien before the fire.  (Dkts.

---

[1] Plaintiff disputes that he owed thousands of dollars in HOA fees at the time of the fire.  (Dkt. 61-1 ¶ 21.)  It is undisputed, however, that the HOA had put a lien on his property for this amount.

50-14 ¶¶ 25–26; 61-1 ¶¶ 25–26.)  He explained that he knew the HOA believed he owed unpaid dues but never received a letter from the HOA attorney notifying him of the lien.   While financial strain is not necessarily "suspicious," Plaintiff's dire financial straits certainly could provide a motive and a basis to question why he decided to use nearly all his savings on an insurance premium just a week or so before the fire.

At the time of the fire, Plaintiff no longer had cable or internet service at his townhouse.  He had not paid his electric bill, and the power company had cut off his electricity.  (Dkts. 50-14 ¶¶ 48–49; 61-1 ¶¶ 48–49.)  Plaintiff admitted having received notices from the electric company threatening to disconnect his service over unpaid bills.  (Dkts. 50-14 ¶¶ 54–55; 61-1 ¶¶ 54–55.)   Georgia Power records show it cut the electricity sometime between May 27 and May 30.  (Dkts. 50-14 ¶ 13; 61-1 ¶ 13.)  The exact date is unclear.  The records show a directive to disconnect his service on May 27 with completed work on May 30.  (Dkt. 61-1 ¶ 57.)   Either way, it is undisputed that Georgia Power had disconnected electricity by at least May 30, which is interesting because Plaintiff and his girlfriend claim they were living at the townhouse until June 2 — a couple days before the fire.  (Dkts. 50-14 ¶ 57; 61-1 ¶ 57.)

### B.   Plaintiff's Renting of Rooms & Meeting with Edward Robinson

Plaintiff claims that, in 2017, he rented bedrooms in his townhouse to people for extra income but had no tenants at the time of the fire. (Dkts. 50-14 ¶ 27; 61-1 ¶ 27.)  He claims to have been in discussions with a friend, Edward Robinson, about renting him two rooms at the time of the fire.  (Dkts. 50-14 ¶ 60; 61-1 ¶ 60.)  Plaintiff and Robinson planned to meet on Friday (June 2), but Robinson did not have rent money.  (Dkts. 50-14 ¶ 77; 61-1 ¶ 77.)  Robinson testified he planned to meet Plaintiff on Monday (June 5).  (Dkts. 50-14 ¶ 77; 61-1 ¶ 77.)

Plaintiff claims he and Robinson planned to meet on Sunday (June 4) — the day of the fire.  He testified that his girlfriend (Jermirah Bratcher) drove him to the property to check on his dogs that day, get his mail, and meet with Robinson to show him the property.  (Dkts. 50-14 ¶ 68; 61-1 ¶ 68.)  He explained that Robinson failed to show up for the meeting or answer his phone calls.  (*Id.*)  Robinson said he never planned to meet with Plaintiff on Sunday, June 4.  (Dkt. 48-4 at 414–6.)  He explained that, when the Friday meeting fell through, he rescheduled for Monday (June 5) when he knew he would have the rent money.  (Dkts. 50-14 ¶ 77; 61-1 ¶ 77.)

Robinson testified that he had planned to live in Plaintiff's residence by himself, not with Plaintiff. He said Plaintiff was going to live with his girlfriend. (Dkts. 48-4 at 52:3–6, 53:3–10; 50-14 ¶ 69; 61-1 ¶ 69.) Robinson also agreed to keep Plaintiff's dogs in the residence and take care of them. (Dkts. 50-14 ¶ 70; 61-1 ¶ 70.) The dogs were always at the house whenever Robinson visited. (Dkts. 50-14 ¶¶ 66, 71; 61-1 ¶¶ 66, 71.) Plaintiff kept them as guard dogs. (*Id*.) This is also strange because (as discussed below) Plaintiff removed his dogs from the house that Sunday evening, just hours before the fire.

Robinson testified that Plaintiff called him late Sunday night to tell him about the fire. (Dkts. 50-14 ¶ 78; 61-1 ¶ 78.)

## C. Plaintiff's Criminal Charges, Acquittal, and Social Media Postings

In March 2017, prosecutors in Clayton County charged Plaintiff and two others with possession of marijuana with intent to distribute and other charges. (Dkts. 50-14 ¶ 28; 61-1 ¶ 28.) While facing those charges (and before the fire), Plaintiff posted on Facebook that he was trying to join the United States military to "go overseas and blow some shit up." (Dkts. 50-14 ¶ 31; 61-1 ¶ 31.) He stated nothing was keeping him in Riverdale as he had no friends or family in the area. (Dkts. 50-14 ¶ 32;

61-1 ¶ 32.)   He claimed he tried to join the military because he was dealing with depression after separating from his fiancée and facing criminal charges.   (Dkts. 50-14 ¶ 33; 61-1 ¶ 33.)   He posted a picture of his two dogs the next day and commented that they would miss him while he was in the military.   (Dkts. 50-14 ¶ 34; 61-1 ¶ 34.)   Plaintiff also testified that, at the time of the fire, he did not consider the property to be his home, other than being a place where he kept his personal property and where he rented rooms for income.   (Dkts. 50-14 ¶ 35; 61-1 ¶ 35.)

On May 23, 2017, a jury acquitted Plaintiff of all criminal charges. (Dkts. 50-14 ¶ 36; 61-1 ¶ 36.)   Law enforcement maintained a presence in Plaintiff's neighborhood to watch for suspected drug activity.   (Dkts. 50-14 ¶¶ 37–38; 61-1 ¶¶ 37–38.)   Plaintiff posted a video on Facebook expressing his desire to leave Riverdale because it was "hot" with police activity and he was trying to determine where to live next.   (Dkts. 50-14 ¶ 39; 61-1 ¶ 39.)  He posted this before the fire.  But at his EUO, Plaintiff denied any plan to leave Riverdale at the time of the fire.   (Dkts. 50-14 ¶ 40; 61-1 ¶ 40.)

### D.   Plaintiff's Whereabouts Before the Fire

Plaintiff met his girlfriend in person for the first time on May 26, a little over a week before the fire.  (Dkts. 50-14 ¶ 50; 61-1 ¶ 50.)  She claims to have spent the night at Plaintiff's townhouse from that day through June 2.  (Dkts. 50-14 ¶ 52; 61-1 ¶ 52.)  Keep in mind Georgia Power had disconnected electrical service by at least May 30.  Plaintiff says that, within a week of meeting each other, he and Bratcher decided to move into her residence in Mableton, Georgia.  (Dkts. 50-14 ¶¶ 51–52; 61-1 ¶¶ 51–52.)  He says they moved into her residence the day before the fire.  (*Id.*)  More reason for suspicion.

Plaintiff testified that Bratcher drove him to his townhouse on Saturday and Sunday so he could care for his dogs and check his mail. (Dkts. 50-14 ¶¶ 65, 67; 61-1 ¶¶ 65, 67.)  On the night of the fire, she drove him to the townhouse around 6:00 p.m.  As explained above, Plaintiff claims he went there to care for his dogs and meet Robinson.  Plaintiff claims that, before leaving Bratcher's Mableton home that evening, he spoke with Robinson on the phone four times to confirm their meeting. (Dkts. 50-14 ¶ 74; 61-1 ¶ 74.)  Robinson did not go to the townhouse that evening and denied having agreed to meet Plaintiff there.  (Dkts. 50-14

¶ 72; 61-1 ¶ 72.)   Telephone records show that Plaintiff never called Robinson after 4:45 p.m. on that day, despite making several other calls that utilized cell towers in Riverdale between 8:47 p.m. and 9:00 p.m. that night.  (Dkts. 50-14 ¶ 76; 61-1 ¶ 76.)

Plaintiff testified that, after grabbing his dogs from the townhouse, he returned to Bratcher's house and did not leave there for the rest of the night.  (Dkts. 50-14 ¶ 79; 61-1 ¶ 79.)  Plaintiff's cell phone records suggest otherwise.  They show he made a call around 7:00 p.m. that night from a cell tower in Midtown Atlanta.  (Dkts. 50-14 ¶ 80; 61-1 ¶ 80.)  He could not explain why he was at that location as it is not between Riverdale (where his townhouse was located) and Mableton (where he and Bratcher were staying).  (Dkts. 50-14 ¶ 80; 61-1 ¶ 80.)  He explained that Bratcher was driving and he was just along for the ride.  Plaintiff's phone then made a call at 7:20 p.m.  It pinged off of a cell tower in Buckhead.  (Dkts. 50-14 ¶ 82; 61-1 ¶ 82.)  Plaintiff attributes this call to riding somewhere unknown with Bratcher.  (Dkts. 50-14 ¶ 82; 61-1 ¶ 82.)  He testified that she worked at a blow dry bar on Peachtree Street in Atlanta and was working at that location on the night of the fire.  (Dkts. 50-14 ¶ 83; 61-1 ¶ 83.)

His cell phone then placed multiple calls from two cell towers near his Riverdale home between 8:47 p.m. and 9:00 p.m., although Plaintiff insists he was back in Mableton at that time.  (Dkts. 50-14 ¶ 84; 61-1 ¶ 84.)  Plaintiff's cell phone placed two more calls at 9:00 and 9:01 p.m., both pinging off of a cell tower in Jonesboro, Georgia, southwest of Plaintiff's home and in the opposite direction from Bratcher's home in Mableton.  (Dkts. 50-14 ¶ 85; 61-1 ¶ 85.)  Plaintiff and Bratcher claim they were back in Mableton at her home by 9:00 p.m. on the night of the fire.  (Dkts. 50-14 ¶ 86; 61-1 ¶ 86.)  Plaintiff's cell phone placed no calls from a cell tower in Mableton until 9:46 p.m. that night.  (Dkts. 50-14 ¶ 87; 61-1 ¶ 87.)  All of this seems very suspicious.

At 11:16 p.m., Riverdale Fire Services received an alarm for the fire at Plaintiff's townhouse.  (Dkts. 50-14 ¶ 88; 61-1 ¶ 88.)

### E.   Plaintiff's Communications with Michael Hare

The parties hotly dispute testimony about what Plaintiff did or did not say to an acquaintance, Michael Hare, before and after the fire.  They also dispute the materiality of Plaintiff's communications with Hare.

According to Michael Hare, Plaintiff called him in the early morning of June 5, claiming his townhouse had a water leak or fire

damage, and asking him to check it out.  (Dkts. 50-14 ¶ 94; 61-1 ¶ 94.)

Hare claims Plaintiff told him he would call the insurance company and

get them to "cut a check before [the fire] could be looked into."  (Dkts. 50-

14 ¶ 97; 61-1 ¶ 97.)  Hare also claims Plaintiff said he and Bratcher had

been at the townhouse on the night of the fire to get his dogs, that they

"left about 9:30[,] and the fire happened after that."  (Dkts. 50-14 ¶ 94;

61-1 ¶ 94.)  At a deposition, Plaintiff denied telling Hare that he was at

the house between 9:00 and 9:30 p.m. on the night of the fire.  (Dkt. 48-6

at 200:18–20.)  He also denied making any statement about calling the

insurance company.

Hare testified that, in a second phone call, Plaintiff said he was

lucky he removed his dogs from the townhouse before the fire.  (Dkts. 50-

14 ¶ 95; 61-1 ¶ 95.)  Hare also said that, seven to nine months before the

fire, Plaintiff told him he wanted his townhouse to burn down because of

intense police scrutiny associated with his suspected drug dealing.  (Dkts.

50-14 ¶ 96; 61-1 ¶ 96.)  Plaintiff denied making these statements.  (Dkt.

61-1 ¶ 96.)  Hare claims he asked Plaintiff if he had set the fire, and

Plaintiff did not deny doing it.  Dkts. 50-14 ¶ 96; 61-1 ¶ 96.)  He also

testified that Plaintiff told him he was glad the fire had occurred.  (Dkts.

50-14 ¶ 98; 61-1 ¶ 98.)   Plaintiff denies making any of these damning statements.[2]

Despite asking him to check on the house immediately after the fire, Plaintiff never identified Michael Hare to State Farm in his EUO as a witness with knowledge of the events occurring around the time of the fire.   State Farm had already spoken with Hare.   (Dkts. 50-14 ¶ 92; 61-1 ¶ 92.)   Plaintiff claims he would have told State Farm about his communications with Michael Hare had State Farm simply asked.   (Dkt. 61-2 ¶ 10.)   He denies intentionally concealing these communications. But when asked if he had contacted anyone else about the fire on the following day besides State Farm and the HOA president, Plaintiff mentioned only the fire department.   (Dkts. 61-2 ¶ 10; 67-4 ¶ 10.)   State Farm repeatedly asked Plaintiff about his general whereabouts and

---

[2] State Farm contends that the Court should disregard Plaintiff Nicholas Trias's affidavit as an inadmissible, conclusory, and self-serving sham affidavit.   (Dkt. 67 at 2.)   "[A] definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence," however. *Santhuff v. Seitz*, 385 F. App'x 939, 945 (11th Cir. 2010).   The Court finds this to be an example of the latter.   Because many of the attestations go to what Plaintiff did or did not say — and do not inherently contradict other parts of the record — the Court declines to strike the affidavit as a sham and considers it in its summary judgment determination.

communications on the day of the fire and the next day.  But Plaintiff never said anything about Hare.  So, despite being asked many times what happened on that day and with whom he had spoken, Plaintiff failed to disclose his discussions with Hare.  (Dkts. 61-2 ¶ 10; 67-4 ¶ 10.)

Plaintiff disputes this, arguing that "State Farm did not ask [him] a single question about his communications with Michael Hare," even though State Farm was aware of and had spoken to Hare before the EUO.  (Dkt. 61-2 ¶ 10.)  Plaintiff claims he identified Michael Hare to State Farm as a person who might have knowledge about the damage to the property following the fire.  (Dkts. 61-2 ¶ 11; 67-4 ¶ 11.)

## F.    State Farm's Investigation

A few days after the fire, State Farm retained fire investigator Jeffrey Morrill to look into the origin and cause of the fire.  (Dkts. 50-14 ¶ 103; 61-1 ¶ 103.)  Morrill spoke with Plaintiff at the property a few days later.  (Dkts. 50-14 ¶ 104; 61-1 ¶ 104.)  The parties dispute whether Plaintiff told Morrill that the house had no electrical power at the time of the fire.  As explained above, the parties agree there was no electrical service.  As a result, Morrill eliminated any accidental electrical cause.  (Dkts. 50-14 ¶ 105; 61-1 ¶ 105.)  And, even though burn patterns on the

flooring showed the door was ajar at the time of the fire, Morrill observed no signs of forced entry.[3]   (Dkts. 50-14 ¶¶ 107–108; 61-1 ¶¶ 107–108.) Plaintiff also testified that, after picking up his dogs, he locked the house when he left that evening.  (Dkts. 50-14 ¶ 91; 61-1 ¶ 91.)  He also testified that no one else had a key to the property and no one except him and Bratcher knew he and his dogs were not at the townhouse on the night of the fire.  (Dkts. 50-14 ¶¶ 89–90; 61-1 ¶¶ 89–90.)

During his investigation, Morrill identified and photographed a red gas can outside the entrance to Plaintiff's property.  (Dkts. 50-14 ¶ 100; 61-1 ¶ 100.)  Michael Hare testified that he saw a red, five-gallon plastic gas can by the main entrance of the townhouse when he went there on the morning after the fire.  (Dkts. 50-14 ¶ 99; 61-1 ¶ 99.)  Hare claims he had visited the property about two weeks before the fire, used that door, and saw no gas can.  (*Id.*)  Plaintiff later said he kept a red gas can in his front yard and even posted to his Facebook account a photograph of the gas can from before the fire.  (Dkts. 50-14 ¶ 101; 61-1 ¶ 101.)  He claims

---

[3] Plaintiff disputes whether Morrill investigated the fire in accordance with Federal Rule of Evidence 702 and thus argues his opinions are inadmissible.  (Dkt. 52.)  As discussed below, the Court finds Morrill's methodology sufficiently reliable and thus admissible, though for other reasons, excludes his ultimate conclusion.

it had been there for a year.  (Dkts. 50-14 ¶ 99; 61-1 ¶ 99.)   Everyone agrees the gas can was by the front door but disputes how long it had been there.  (Dkts. 50-14 ¶ 102; 61-1 ¶ 102.)  Morrill classified the fire as intentional.  (Dkts. 50-14 ¶ 112; 61-1 ¶ 112.)

Fintan Hobbs, another fire investigator working for the HOA's insurer, Chubb Custom Insurance Company, conducted an independent investigation of the fire.  He reached the same conclusion as Morrill about the origin area of the fire and also classified it as intentional.  (Dkts. 50-14 ¶ 114; 61-1 ¶ 114.)

Two months after the fire, State Farm took Plaintiff's EUO and requested he submit various documents to support his claim.  (Dkts. 50-14 ¶ 6; 61-1 ¶ 6.)  State Farm told Plaintiff he needed to review the transcript of his examination, make any necessary changes, and sign the errata sheet to verify his testimony.  (Dkts. 50-14 ¶ 7; 61-1 ¶ 7.)  State Farm warned him that misrepresentations or concealments of material facts could lead to the denial of his claim.  (Dkts. 50-14 ¶ 8; 61-1 ¶ 8.) Plaintiff made no corrections to his EUO testimony before signing it.

Plaintiff submitted a sworn statement to State Farm claiming a replacement cost of $150,000 for the building and $75,000 for his personal

property.   (Dkts. 50-14 ¶ 116; 61-1 ¶ 116.)   He submitted a personal contents inventory claiming a variety of items, including multiple televisions allegedly in the townhouse and destroyed by the fire or otherwise missing.   (Dkts. 50-14 ¶ 115; 61-1 ¶ 115.)   He also claimed a safe containing a diamond engagement ring was stolen from his master bedroom closet.   (Dkts. 50-14 ¶ 117; 61-1 ¶ 117.)   Plaintiff testified that the diamond ring was a gift from a family friend, but did not know that person's name.   (Dkts. 50-14 ¶ 118; 61-1 ¶ 118.)   Hard to believe.

Based on his observations and investigation, Morrill testified there was no safe in the master bedroom closet as there were no imprints of a safe in the carpet.   (Dkts. 50-14 ¶ 119; 61-1 ¶ 119.)   State Farm investigator Bilinda Thomas also visited the scene after the fire and observed that many items on Plaintiff's personal contents inventory were not there.   (Dkts. 50-14 ¶ 120; 61-1 ¶ 120.)   She also noted that debris from the fire contained no evidence that much of the personal property claimed was damaged or destroyed in the fire.   (Dkts. 50-14 ¶ 113; 61-1 ¶ 113.)

Michael Hare also testified that Plaintiff's home was in poor condition before the fire, with minimal furnishings, including having no

televisions, no washer, and no dryer.  Based on his observations after a couple of dozen visits to the property, Hare described it as a "drug house." (Dkts. 50-14 ¶ 121; 61-1 ¶ 121.)  The Riverdale Fire Services fire report noted that the townhouse had contents worth only $2,500 before the fire even though Plaintiff submitted claims to State Farm for contents worth $75,000.  (Dkts. 50-14 ¶ 122; 61-1 ¶ 122.)  Morrill and State Farm's inspections concluded Plaintiff's townhouse actually contained very few of the items Plaintiff claimed.  (Dkts. 50-14 ¶ 123; 61-1 ¶ 123.)

Plaintiff has his gripes about State Farm's investigation.  He argues it failed to investigate the potential involvement of Cyrille Kamdem who also goes by the name of Swayze Kettleman and was one of Plaintiff's former co-defendants.  (Dkts. 61-2 ¶ 24; 67-4 ¶ 24.)  Plaintiff claims Kettleman/Kamdem threatened him at a gas station two months after the fire, saying "next time your ass will be in there."  (Dkts. 61-2 ¶¶ 27–28; 67-4 ¶¶ 27–28.)  State Farm's lead investigator admitted he could not rule out the possibility that Kettleman/Kamdem started the fire.  (Dkts. 61-2 ¶ 29; 67-4 ¶ 29.)  State Farm never contacted him as part of the investigation.  (Dkts. 61-2 ¶ 31; 67-4 ¶ 31.)  State Farm's investigator, however, found no evidence of forced entry and concluded no one had

broken into Plaintiff's townhouse; stolen his televisions, diamond rings, and other property; and burned down his house.  (Dkt. 67-4 ¶ 29.)  The investigation concluded no one had stolen anything from the house before the fire.  (Dkt. 67-4 ¶ 31.)

### G.    The Insurance Policy Provisions

The insurance policy at issue contained three relevant provisions: the Intentional Acts provision, the Concealment or Fraud provision, and the Other Insurance provision.  The Policy explicitly excludes coverage for damage resulting from an intentional act of an insured.  It provides:

> 12.    **Intentional Acts.** If you or any other insured causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits[,] we will not pay you or any other insured for this loss.

(Dkts. 50-14 ¶ 4; 61-1 ¶ 4.)  The policy also contains a "Concealment or Fraud" provision, which excludes coverage when an insured intentionally conceals or misrepresents any material fact relating to the insurance. The Policy provides:

> 2.    **Concealment or Fraud**
>
> a.    We do not provide any coverages under this policy for you or any other insured, if you or any other insured has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

18

However, this Condition applies only to facts or circumstances:

(1)    on which we rely and are either:

    (a)    material, or

    (b)    made with intent to deceive; or

(2)    which contribute to the loss.

b.    No failure of a policy condition before the loss and no breach of a promissory warranty affects our obligations under this policy unless such failure or breach exists at the time of loss and either:

(1)    increases the risk at the time of loss; or

(2)    contributes to the loss.

This item, b., does not apply to failure to tender payment of premium.

(Dkts. 50-14 ¶ 5; 61-1 ¶ 5.)  The policy also contains an "Other Insurance" provision:

5.    **Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only our share of the loss. Our share is the proportion of the loss that the applicable limit under this policy bears to the total amount of insurance covering the loss.

(Dkts. 61-2 ¶ 18; 67-4 ¶ 18.)  The other insurance provision is relevant because Plaintiff's HOA had mandatory insurance coverage on the townhouse for its structural repairs.  Plaintiff's townhouse was rebuilt under dwelling coverage provided by the Taylor Ridge HOA's insurer,

Chubb Custom Insurance Company.  (Dkts. 50-14 ¶ 130; 61-1 ¶ 130.)
Plaintiff, however, claims that the rebuild of his property did not include
upgrades he had made to the property before the fire.  (Dkt. 61-1 ¶ 130.)
He moved back into the property about a year after the fire.  (Dkts. 50-
14 ¶ 132; 61-1 ¶ 132.)

Following completion of its investigation, State Farm denied
Plaintiff's claim.  (Dkts. 50-14 ¶ 10; 61-1 ¶ 10.)  State Farm asserted that
Plaintiff violated the Policy's Concealment or Fraud provision and the
Intentional Acts provision.  Plaintiff sued Defendant State Farm in the
Superior Court of Clayton County for breach of contract and bad faith.
(Dkt. 1-3.)  Defendant removed the case to federal court and, after the
close of discovery, moved for summary judgment on both of Plaintiff's
claims.  (Dkts. 1; 50.)  Plaintiff also seeks to exclude the testimony of the
two fire investigators who testified about the cause and origin of the fire.
(Dkts. 52; 53.)

## II.    Legal Standard

### A.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a court
"shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact that a jury should decide at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A moving party meets this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The movant, however, need not negate the other party's claim. *Id.* at 323. In determining whether the moving party has met this burden, a court must view the evidence and all reasonable factual inferences in the light most favorable

to the party opposing the motion.  *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Ultimately, there is no genuine dispute for trial when the record as a whole could not lead a rational trier of fact to find for the nonmoving party.  *Id.*  But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48.  The court, however, resolves all reasonable doubts in the favor of the non-movant.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (internal quotation marks omitted).

## B.    Motion to Exclude

Trial courts serve a critical gate-keeping function for the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Expert testimony can be particularly persuasive, and as such, the role of the trial court is to keep speculative and unreliable testimony from reaching the jury. *Id.* at 595; *see McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

Federal Rule of Evidence 702 allows a qualified expert to give opinion testimony when it is necessary to help the trier of fact understand the issues, the opinion is based on sufficient facts or data, the expert produced it using reliable principles and methods, and those principles and methods were reliably applied to the facts of the case. Fed. R. Evid. 702. The Eleventh Circuit employs a "rigorous" three-part inquiry to determine whether an expert's testimony meets these admissibility criteria. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Expert testimony is admissible when

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and

> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (internal footnote omitted). Thus, the admissibility of an expert's opinion turns on three things: qualifications, reliability, and helpfulness. *See United States v. Frazier*, 387 F.3d 1244, 1260–62 (11th Cir. 2004).

While the trial court's role is critical, it "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999). When the accuracy of evidence is the issue — as opposed to its admissibility — the trial court should allow the judicial process to resolve the matter. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## III. Discussion

### A. Defendant State Farm's Motion for Summary Judgment (Dkt. 50)

Plaintiff asserts claims against State Farm for breach of contract for its failure to pay his insurance claim following the fire and for bad-faith refusal to settle under Georgia state law. State Farm moves for summary judgment on both counts.

### 1.    Count I – Breach of Contract

State Farm seeks summary judgment on Plaintiff's claim for payment of the insurance proceeds, alleging Plaintiff violated the policy's Concealment or Fraud provision based on multiple misrepresentations and concealment of material facts.  Plaintiff counters that a genuine dispute of fact exists about whether he intentionally concealed material information and thus precludes summary judgment. (Dkt. 61 at 3.)  With some hesitation, the Court agrees on this point and denies State Farm's motion in part.

Under the policy's Concealment or Fraud provision and Georgia law, to void a contract and deny coverage, an insurer must prove by a preponderance of the evidence that the insured intentionally concealed and/or misrepresented material facts relating to the loss.  Essentially, there must be a misrepresentation or concealment, the misrepresentation must be intentional, and the misrepresentation must concern a material fact.  *Perry v. State Farm Fire & Cas. Co.*, 734 F.2d 1441, 1443 (11th Cir. 1984).  So, to prevail on summary judgment then, the insurance company must show that no dispute of material fact exists that the insured's misrepresentations or concealments were material and

that he made them intending to deceive the insurer. *See Liberty Corp. Capital, Ltd. v. Bhanu Mgmt., Inc.*, 161 F. Supp. 3d 1307, 1321 (S.D. Ga. 2015) (granting summary judgment to insurer because insured "fail[ed] to demonstrate that any genuine issue of material fact exists as to its state of mind"). These inquiries, however, are typically fact questions for the jury to decide. And a court must not decide any factual issues in the record. Rather, where factual issues are present, "the court must deny the motion and proceed to trial." *Impossible Elecs. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. Unit B 1982).

After carefully reviewing the entire record, the Court holds that State Farm has not met its burden of showing that Plaintiff's misrepresentations were material to its decision to deny the claim. The record also contains at least disputed evidence that Plaintiff's concealments were intentional. The Court recognizes the questionable circumstantial evidence and coincidences sprinkled throughout the record. The Court has tried to highlight many of the suspicious circumstances surrounding Plaintiff's claim against State Farm. Suffice to say, there is significant evidence that Plaintiff caused the fire at his

townhouse and then lied about the contents that he lost. Much of what he says is very hard to believe. But, on summary judgment, the Court must accept Plaintiff's version of the facts, view the evidence in the light more favorable to him, and draw all reasonable inferences in his favor. While the Court may believe the evidence shows Plaintiff made numerous material misrepresentations and may believe a jury will likely find the same, a jury will have to make that decision.

### a.    Materiality

Under Georgia law, "[a] misrepresentation is material if it might affect the insurer's action in respect to . . . settlement or adjustment of the claim of the insured." *Perry*, 734 F.2d at 1443 (citing *Am. All. Ins. Co. v. Pyle*, 8 S.E.2d 154, 160 (Ga. Ct. App. 1940)) (alterations adopted). But "the insurer need not actually rely on the representation or suffer any prejudice therefrom." *Id.* Misrepresentations that go to "core" issues are generally considered material, while those that are "a mere nicety or a matter of administrative convenience" are generally immaterial. *Woods v. Indep. Fire Ins. Co.*, 749 F.2d 1493, 1496 (11th Cir. 1985).

Whether a particular misrepresentation is material is ordinarily a jury question. *Id.* at 1497. But a court may decide the issue as a matter

of law where "the evidence excludes every reasonable inference except that there was or was not a material misrepresentation." *Perry*, 734 F.2d at 1444.  Materiality, then, is "a mixed question of law and fact that can be decided as a matter of law if reasonable minds could not differ on the question." *Woods*, 749 F.2d at 1496.

Upon viewing the facts in the light most favor to Plaintiff, however, reasonable minds could differ on whether any of the misrepresentations were material.  State Farm points to six misrepresentations or omissions that it claims Plaintiff made that preclude coverage.  (Dkt. 50-1 at 11.) These include statements about his intentions of leaving the Riverdale area, the specifics of his visit to the property on the night of the fire, his knowledge of the termination of electric power, his communications with Michael Hare, the personal contents within the property at the time of the fire, and his history of past insurance losses.  (*Id.* at 11–24.)  But State Farm cannot meet its burden to show that any of these misrepresentations were material, as a matter of law.  The evidence simply does not compel that conclusion and thus summary judgment is improper.

For instance, State Farm argues that it is entitled to summary judgment based on alleged misrepresentations made by Plaintiff about his plans to move out of the Riverdale area. (Dkt. 50-1 at 13–16.) The facts are in dispute whether Plaintiff actually planned to leave Riverdale. But even if he did intend to leave the area around the time of the fire, State Farm has not established how this information was material to its investigation. State Farm, as the insurer, has the burden of establishing the materiality of any information used to support its defense. *Fiveash v. Allstate Ins. Co.*, 603 F. App'x 773, 775 (11th Cir. 2015). But State Farm instead asks the Court to "infer" that any misstatements or concealments were material and were made with deliberate deceit. The Court will not make inferences on the behalf of State Farm, as the summary judgment movant. *See id.* at 777 ("We simply cannot, as the district court did, necessarily infer the [insureds'] intent to defraud the insurance company."). The Court concludes that State Farm has not established as a matter of law that any misrepresentation by Plaintiff about his intentions of moving materially impacted its decision in settling or adjusting his claim.

The same analysis applies to State Farm's contention about Plaintiff's alleged misrepresentations regarding the electricity shutoff. (*See* Dkt. 50-1 at 19–21.)  State Farm goes through the he-said-she-said dispute of the facts about when and why Georgia Power cut the electricity to the house, but never argues why alleged misrepresentations about this would be material to its decision-making.  Regardless, the record contains a dispute about why the power was cut and when or if Plaintiff told anyone about it.  This alone precludes summary judgment on the materiality of these representations.

The same is true for Plaintiff's communications with Michael Hare and whether his failure to disclose them to State Farm constitutes a material omission entitling it to void the policy.  State Farm knew about Michael Hare before Plaintiff's EUO but declined to ask him any questions about their communications.  The record thus contains evidence from which a reasonable juror could conclude that Plaintiff's communications with Hare were *not* material to State Farm's investigation.  Further, Plaintiff's communications to Hare remain in dispute.

The record also contains a dispute about the personal contents within the property and whether Plaintiff misrepresented them. For instance, Plaintiff testified about the loss of a safe in his bedroom closet containing a diamond engagement and wedding ring set. But State Farm's expert, Jeffrey Morrill, testified that he found no evidence of a safe ever being there. Plaintiff's claim that a family member gave him the engagement ring but cannot recall the person's name. This is farfetched and possibly even absurd. And while a misrepresentation about the quantity and value of items in a proof of loss sheet is generally material to an insurance company's decision to deny a claim and thus voids the policy, the record here contains a dispute of fact about the house's contents. *See Fuller-Dorce v. State Farm Fire & Cas. Co.*, No. 1:15-cv-2197-TCB, 2016 WL 7887998, at *3 (N.D. Ga. Sept. 20, 2016) ("The amount of an insured's claim after a loss is of critical importance to the insurer's action on the claim and is not a mere nicety or a matter of administrative convenience." (quoting *Woods*, 749 F.2d at 1496)).

The Court cannot say, as a matter of law, that any alleged misrepresentations by Plaintiff were material such that State Farm could void the policy under the Concealment or Fraud clause.

### b.   Intent

Even assuming that there was no dispute about Plaintiff's misrepresentations, and that they were indisputably material to State Farm's decision to deny his claim, the Court cannot say (as a matter of law) that Plaintiff "uttered them with a clear intent to mislead or otherwise defraud" State Farm. *Ga. Farm Bureau Mut. Ins. Co. v. Richardson*, 457 S.E.2d 181, 184 (Ga. Ct. App. 1995). "It must appear that an insured's false statements were made willfully and intentionally for the purpose of defrauding the insurer." *Pyle*, 8 S.E.2d at 160.

State Farm has not eliminated genuine dispute about Plaintiff's intent. It focuses a great deal on the discrepancies in Plaintiff's whereabouts on the evening of the fire, specifically on alleged misrepresentations by Plaintiff about his location between 6:00 p.m. and 9:47 p.m. on that night. But the record contains nothing reflecting an intent willfully to deceive State Farm. The Court recognizes that the inferences, however, are certainly dangling there, and State Farm asks the Court to draw those inferences in its favor. But those would be inferences for a factfinder to draw, not the Court. The Court may not simply believe the movant's evidence and draw reasonable inferences on

its behalf.  On the contrary, at summary judgment, the Court must believe Plaintiff's evidence and draw reasonable inferences on his behalf. *See Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1315 (11th Cir. 2007) ("To the extent that evidence conflicts at summary judgment, the district court has an obligation to view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." (internal quotation marks omitted)).  In doing so, the Court finds that it cannot say, as a matter of law, that no genuine dispute of material fact exists about Plaintiff's intent to deceive State Farm.

Plaintiff does not concede that he made false representations or that he knew they were false.  State Farm argues he did.  This is a credibility determination for a jury, not for a court to make on summary judgment.  And "[w]hether a claim was fraudulently or innocently made [is] a question peculiarly within the province of the jury." *Camden Fire Ins. Ass'n v. Penick*, 2 F.2d 964, 965 (5th Cir. 1924).  Genuine issues of material fact thus exist on whether Plaintiff made misrepresentations to State Farm with the requisite intent to deceive.

"[J]udgment as a matter of law can be entered only when the evidence favoring the movant is so one-sided as to be of overwhelming

effect." *Fiveash*, 603 F. App'x at 775 (internal quotation marks omitted) (alterations adopted).  The evidence, though admittedly leaning in State Farm's favor, is not so one-sided as to permit summary judgment.  The Court thus denies State Farm's motion for summary judgment on Plaintiff's breach of contract claim.[4]

### 2.    Count II – Bad Faith Claim under § 33–4–6

Plaintiff asserts that State Farm failed to properly or fully investigate his claim and thus he is entitled to bad-faith damages under Georgia law.  (Dkt. 61 at 18.)  State Farm argues, because its denial of his claim was neither frivolous nor unfounded, it is entitled to summary judgment on this claim.  Based on the record, the Court agrees with State Farm and grants summary judgment on Count II of Plaintiff's complaint.

Under Georgia law, a plaintiff may be entitled to additional bad-faith damages if (1) the policy covered the insured's claim; (2) the insured made a proper demand for payment at least sixty days before filing suit;

---

[4] State Farm alternatively moves for summary judgment as to Plaintiff's structural dwelling damages, as he has already recovered from his HOA's mandatory insurance policy for the rebuilding of his home.  (Dkt. 50-1 at 9.)  Because Plaintiff may not doubly recover his damages, the Court grants State Farm's motion on this issue and would limit any recovery by Plaintiff to only those damages for which he has not already recovered.

and (3) the insurer's failure to pay was motivated by bad faith or based on frivolous defenses. *BayRock Mortg. Corp. v. Chi. Title Ins. Co.*, 648 S.E.2d 433, 435 (Ga. Ct. App. 2007).  In this context, "bad faith" means "any frivolous and unfounded refusal in law or in fact to comply with the demand of the policyholder to pay according to the terms of the policy." *Progressive Cas. Ins. Co. v. Avery*, 302 S.E.2d 605, 606 (Ga. Ct. App. 1983).

But penalties for bad faith and attorneys' fees are not authorized where the insurer had *any* reasonable ground to contest the claim.  *Id.* at 608.  If genuine factual issues exist about whether an insurer has reasonable grounds to withhold payment, there can be no bad faith as a matter of law.  *See Allstate Ins. Co. v. Smith*, 597 S.E.2d 500, 503 (Ga. Ct. App. 2004).  Thus, "it is the very fact that certain factual issues regarding the merits of a claim are in genuine conflict that causes there to be no conflict, as a matter of law, whether an insurance company had reasonable grounds to contest a particular claim." *Richardson*, 457 S.E.2d at 185.

The Court holds that State Farm had at least reasonable, nonfrivolous grounds to deny his claim.  State Farm argues that Plaintiff

violated the Concealment or Fraud provision of the contract by fraudulently concealing or misrepresenting material facts during the investigation and thus it had a right to void the policy. As explained above, the Court finds the evidence largely supports all of State Farm's allegations that Plaintiff made multiple misrepresentations — just not to the point of entitling State Farm to summary judgment. But, without any hesitation, the Court finds State Farm's evidence colorable — and certainly nonfrivolous — on the propriety of State Farm's denial of the claim.

In response, Plaintiff argues that State Farm's investigation of his claim was so deficient as to preclude summary judgment because it focused exclusively on determining that the fire was not a covered loss. (Dkt. 61 at 18.) The Court does not agree. The cases Plaintiff cites are inapposite, in that those investigations were comparatively minimal. (*See id.* at 18–19.) For instance, in *Georgia Farm Bureau Mutual Insurance Co. v. Murphy*, the insurer focused solely on proving a vehicle's damage resulted from a fire, as opposed to an earlier collision, which the insurance policy would cover. 411 S.E.2d 791, 793–94 (Ga. Ct. App. 1991). And in *United Services Automobile Association v. Carroll*, the

insurer failed to speak with any eyewitnesses, instead relying solely on a cursory, incomplete investigation based on the limited statement of the injured, elderly insured to deny a medical payment claim.  486 S.E.2d 613, 616 (Ga. Ct. App. 1997).

Here, State Farm conducted a thorough investigation of the fire, including its decision to retain Jeffrey Morrill to conduct an expert investigation, site visits by multiple claims representatives, witness interviews, receipt of non-party documents, the taking of Plaintiff's EUO, and an analysis of Plaintiff's personal contents inventory.  On top of the existence of reasonable, nonfrivolous reasons to deny Plaintiff's claim based on the dispute surrounding the fire, this thorough investigation thus otherwise precludes Plaintiff's claim for bad faith under § 33–4–6. The Court grants summary judgment to State Farm on Plaintiff's bad-faith claim.

### B.   Plaintiff Nicholas Trias's Motions to Exclude Expert Testimony (Dkts. 52; 53)

Plaintiff moves to exclude the expert testimony of State Farm's retained expert Jeffrey Morrill, along with the testimony of Fintan Hobbs, the fire investigator hired by the HOA's insurer.  (Dkts. 52; 53.) Plaintiff argues, under *Daubert* and Federal Rule of Evidence 702, their

opinions are not based on scientific, technical, or otherwise specialized knowledge, and thus the Court must exclude them. (Dkt. 52-1 at 1.) The Court grants in part Plaintiff's motion about Jeffrey Morrill's expert testimony but denies the motion to exclude Fintan Hobbs's testimony.

### 1.    Testimony of Jeffrey Morrill

Plaintiff does not challenge Jeffrey Morrill's qualifications as a fire expert. Those qualifications are undisputed. He has been an IAAI Certified Fire Investigator and has worked in the public and private sector investigating fires for nearly three decades. (Dkt. 58 at 1–2.) He is also a contributing member of the National Fire Protection Association ("NFPA") committee charged with developing the guide for fire investigations. (*Id.* at 2.)

What Plaintiff instead challenges is Morrill's ultimate conclusion that the fire was intentionally set, which Plaintiff contends Morrill impermissibly reached through the use of "negative corpus." (Dkt. 52-1 at 1.)[5] Although the Court disagrees with Plaintiff's argument about the

---

[5] In support of his motion, Plaintiff submitted an affidavit from his expert William Hicks, evaluating the reliability of Morrill's investigation. (Dkt. 64-3.)   State Farm moves to strike the affidavit as untimely and improper. (Dkt. 68.)  Because State Farm already had Hicks's full report

negative corpus, the Court does agree that Morrill's conclusion would not help a jury and thus grants in part Plaintiff's motion.

For background, under the negative corpus method — a term of art in the fire investigation community — an investigator reaches a conclusion simply because he or she rules out all other alternatives, even though no affirmative evidence of the ultimate conclusion exists. But "the scientific method does not allow an investigator to opine on what started the fire *when there is no evidence supporting his opinion*." *Owners Ins. Co. v. White*, No. 2:12-cv-00233-WCO, 2014 WL 12461045, at *4 (N.D. Ga. Jan. 23, 2014). And the NFPA's Guide for Fire and Explosion Investigations ("NFPA 921") specifically condemns use of negative corpus, warning that it "is not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses, and may result in incorrect determination of the ignition source and first fuel ignited." NFPA 921 § 19.6.5. State Farm instead contends that Morrill generated his conclusion not through negative

---

prior to the close of discovery, thus eliminating any concerns of unfair surprise, the Court denies State Farm's motion to strike.

corpus but through the process of elimination, which "remains a cornerstone of the scientific method." *White*, 2014 WL 12461045, at *4.

State Farm argues Morrill "based his process of elimination reasoning upon his observation and inspection of physical evidence at the scene, supplemented by his recognition and analysis of irregular burn patterns on the living room floor leading to the front doorway, as well as fire dynamics." (Dkt. 58 at 13.)  He relied on extensive evidence discussed in his depositions, reports, affidavit, and photographs to support his conclusions.

For instance, after washing and clearing the living room floor, he observed irregular burn patterns, which he testified point to an ignitable liquid being poured in that area.[6]  His investigation also revealed minimal fuel loads present in the living room to support a fire of this size. He eliminated a cooking fire and kitchen appliances as the cause of the fire, given that the property was unoccupied, and the power had been

---

[6] Morrill's three samples from areas of the living room floor tested negative for ignitable liquids.  (Dkt. 58 at 17.)  This fact, however, goes to the reliability of his testimony, not its admissibility.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

disconnected.  He further eliminated an accidental electrical fire as the cause by confirming that the power was turned off.  Plaintiff told Morrill that no smoking activities occurred at the property on the night of the fire and that it was unoccupied and secure when he left that night after picking up his dogs.  Morrill thus could eliminate all other accidental causes.  *See White*, 2014 WL 12461045, at *3 (noting that whether expert "properly eliminated potential accidental causes goes towards the weight rather than the admissibility of his testimony").

The Court finds the analysis in *Owners Insurance Co. v. White* especially helpful, persuasive, and applicable here.  2014 WL 12461045. In *White*, the district court considered a combination of summary judgment and exclusion motions much like those filed in this case, based on a fire at a defunct, unoccupied winery and whether it was a covered loss under the insurance policy.  *Id.* at *1.  The parties moved to exclude each other's fire investigators' testimony, one of whom concluded that the fire was intentionally set based on the expert's inability to identify an accidental cause.  *Id.*

The Court explained that "[the expert] did not find a satisfactory explanation based on an accidental cause.  Therefore, [he] concluded that

the fire was intentionally set using the available materials and a match or lighter as the ignition source. The inference is known as 'negative corpus.'" *Id.* at *2 (internal citations omitted). But that is not what happened here. In *White*, the expert "concluded that a match or a lighter started the fire because those are the two most likely things an individual would use, *not because he found any evidence indicating the use of either*." *Id.* at *4 (emphasis added). Yet Morrill did not speculate on what started the fire, like a match or a lighter. Instead, he properly used the process of elimination to conclude that, after ruling out accidental causes, the fire was incendiary. He did not improperly then take his analysis beyond that, into the impermissible realm of "negative corpus," to opine about the fire's exact ignition source (i.e., a match or a lighter). Based on his investigation, Morrill merely opined that the lack of accidental causes suggests that the fire was incendiary.

Even so, the Court finds that this ultimate conclusion is "not beyond the understanding of an average lay person" and is subject to exclusion. *See Frazier*, 387 F.3d at 1262. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen.*

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). As was the case in *White*, "[t]he jury does not need an expert to draw inferences within the jury's competence; an expert who does so fails to provide 'helpful' testimony under Rule 702." 2014 WL 12461045, at *4.

So, while the Court will not exclude testimony about Morrill's methodology and observations, his ultimate conclusion — that the fire was incendiary — "would not be helpful because it would not tell the jury anything that lay persons could not logically deduce on their own. He would be drawing his conclusion in the same manner as lay persons, i.e., by exercising simple logic." *Somnis v. Country Mut. Ins. Co.*, 840 F. Supp. 2d 1166, 1173 (D. Minn. 2012) (alterations adopted) (internal quotation marks omitted). Morrill thus may testify about his investigation and all of his observations. He can testify about how he excluded causes other than intentional misconduct. He "may testify that he could not identify an accidental cause for the fire, and the jury will be fully capable of concluding whether the lack of accidental causes and other evidence at trial is sufficient to find for the plaintiff." *See White*, 2014 WL 12461045, at *4. The Court thus grants in part Plaintiff's motion to exclude Jeffrey Morrill's ultimate conclusion.

### 2.    Fintan Hobbs's Testimony

Plaintiff also moves to exclude the testimony of Fintan Hobbs, on generally the same basis as his argument to exclude Morrill's testimony. Chubb Custom Insurance Company, the HOA's insurer, retained Hobbs to "conduct an investigation into the Fire to determine its origin and cause." (Dkt. 53-1 at 3.)  State Farm, however, did not retain Hobbs as an expert.  And thus, because it does not intend to use his testimony as an expert witness, it did not have to produce a full expert report.  *See* Fed. R. Civ. P. 26(a)(2) (requiring written report "if the witness is one retained or specially employed to provide expert testimony in the case"). At this time, neither party has deposed Hobbs and the substance of his full findings and expert opinion is not known.  Thus, because the bases for his opinions cannot be ascertained at this time, Plaintiff's motion to exclude his expert testimony is improper.  For this reason, along with the other reasons outlined in State Farm's response brief, the Court denies Plaintiff's motion to exclude the expert testimony of Fintan Hobbs.[7] (Dkt. 53.)

---

[7] State Farm moves for leave to file a surreply.  (Dkt. 69.)  The Court grants State Farm's motion and has considered its surreply in ruling on Plaintiff's motion to exclude Hobbs's testimony.  (Dkt. 69-1.)

## IV.   Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Defendant State Farm's Motion for Summary Judgment (Dkt. 50). The Court **DENIES** the motion for Plaintiff's breach of contract claim but **GRANTS** the motion for Plaintiff's § 33–4–6 bad-faith claim.

The Court **GRANTS** Defendant State Farm's Motion for Leave to File Surreply (Dkt. 69) but **DENIES** Plaintiff Nicholas Trias's Motion to Exclude Expert Testimony of Fintan Hobbs (Dkt. 53).

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion to Exclude the Expert Testimony of Jeffery Morrill (Dkt. 52).  The Court **DENIES** the motion as to Morrill's general methodology and observations but **GRANTS** the motion as to his ultimate conclusion.  The Court **DENIES** Defendant State Farm's Motion to Strike the Affidavit of William Hicks (Dkt. 68).

The Court **ORDERS** this case to mediation.  The parties may retain the mediator to mediate this case.  The expense of a retained mediator must be paid by the parties.  The parties, alternately, may request that the Court appoint a magistrate judge to conduct the mediation.  The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court, on or before April 15, 2020, of their mediation preference.  If they elect to retain their own mediator, the parties shall identify the mediator on or before April 29, 2020.  The parties must have present at the mediation a person with authority to settle this litigation.

The parties shall, within five days after the mediation, notify the Court in writing whether mediation led to a settlement of this action.

The Court **STAYS** this case pending mediation.  The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 16th day of March, 2020.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE